UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DANYALE SHARRON TUBBS,

                Plaintiff,

v.

UNKNOWN HAGGAGI, et al.,

                Defendants.

_____/

Case No. 1:25-cv-782

Honorable Phillip J. Green

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. In a separate order, the Court granted Plaintiff leave to proceed *in forma pauperis.* (ECF No. 8.)  Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States Magistrate Judge.  (ECF No. 1, PageID.46.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court is required to conduct this initial review prior to the service of the complaint.  *See In re Prison Litig. Reform Act,* 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth,* 114 F.3d 601, 604–05 (6th Cir. 1997).  Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g., Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States Magistrate Judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ."

2

28 U.S.C. § 636(c).  Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent from the defendants[; h]owever, because they had not been served, they were not parties to this action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief.  28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c).  The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).  Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Alsuraimi, Clemons, Satterlee, LaMontagne, Thompson, Rurka,

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

Cline, Morrison, and Lester.  The Court will also dismiss, for failure to state a claim, the following claims against the remaining Defendants Haggagi, Weber, Knaack, Cook, Griffiths, Carr, Blackmere, and Peek: First Amendment claims concerning Plaintiff's access to the courts, Plaintiff's right to petition the government, and Plaintiff's legal mail and attorney-client communications, Sixth Amendment claims, Fourth Amendment claims for unreasonable search and seizure, Eighth Amendment claims, and Fourteenth Amendment equal protection and due process claims. Plaintiff's First Amendment retaliation claims against Defendants Haggagi, Weber, Knaack, Cook, Griffiths, Carr, Blackmere, and Peek remain in the case.

## Discussion

### I.     Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan.  The events about which he complains, however, occurred at the Lakeland Correctional Facility (LCF) in Coldwater, Branch County, Michigan.  Plaintiff sues the following LCF Defendants: Correctional Officers Unknown Haggagi, Unknown Weber, Unknown Griffiths, Unknown Hinkle, Unknown Carr, Unknown Knaack, Unknown Cook, Unknown Blackmere, Unknown Peek, and Unknown Alsuraimi, Sergeants Unknown Clemons and Unknown Satterlee, Lieutenant Unknown Lamontagne, Law Librarian Unknown Thompson, Assistant Deputy Wardens Unknown Rurka and Unknown Cline, Warden Bryan Morrison, and "RHIT, Health Information Dept." Connie Lester.

Plaintiff alleges that he was transferred to LCF on March 7, 2023, and placed in the "Intake Unit." (Compl., ECF No. 1, PageID.7.)  While in the Intake Unit, Plaintiff continued to litigate his pending lawsuits, have access to his attorney, visit the law library, and mail legal mail. (*Id.*, PageID.7–8.)  A couple of weeks later, Plaintiff was moved to the "E-2 Dorms," a disciplinary unit, though Plaintiff did not have any incidents of misbehavior while at LCF. (*Id.*, PageID.8.)  Plaintiff alleges that Defendants Morrison, Rurka, and Cline were responsible for prisoner placement at LCF. (*Id.*)

While in the E-2 Dorms, Plaintiff would often work on his pending litigation in the dayroom area and discuss litigation matters with other prisoners. (*Id.*) Thereafter, Defendants Knaack, Haggagi, Weber, Griffiths, Hinkle, and Carr began to conduct regular cell and body searches of Plaintiff without "any legitimate reasons," each having stated that Plaintiff was a "trouble maker" [sic] and was encouraging other inmates to file lawsuits. (*Id.*)

Plaintiff also needed records and documents from "LCF staff" to prepare for mediation in *Tubbs v. Davis*, to complete the "discovery process" in *Tubbs v. Cunningham*, and to assist his attorneys in his appeal in *Tubbs v. Payton*. (*Id.*)  "LCF staff" did not provide Plaintiff with the necessary documents. (*Id.*, PageID.10.) Additionally, Defendant Lester delayed the processing of Plaintiff's June 2023 request for dental records, which then required that Plaintiff rush to prepare his response to a motion for summary judgment concerning claim for inadequate dental care in the matter of *Tubbs v. Cunningham*. (*Id.*)

5

Plaintiff contacted Defendants Morrison, Rurka, and Cline "in the hopes of finding relief and resolve without being subjected to more backlash." (*Id.*)  However, his "attempts at seeking relief from LCF staff supervisors were to no avail." (*Id.*)

On March 24, 2023, Defendant Thompson denied Plaintiff access to law library materials and photocopies, including documents related to the MDOC's response to COVID-19.  (*Id.*, PageID.11.)  Defendant Thompson explained to Plaintiff that she did not know what documents Plaintiff was requesting and that Plaintiff was not allowed any more free copies until he paid his debts.  (*Id.*)  Plaintiff alleges that these documents were needed to "overcome[e] defendants summary judgment motion" in *Tubbs v. Cunningham*, and that, because of his inability to obtain them, Plaintiff's case was dismissed.  (*Id.*, PageID.11–13.)  An "on-looking inmate bystander" told Plaintiff that Defendant Thompson was not assisting Plaintiff with Plaintiff's requests because Defendant Thompson "doesn't like the fact that [Plaintiff was] suing staff."  (*Id.*, PageID.11)  Plaintiff states that Defendant Thompson also denied Plaintiff's requests for photocopies on other occasions, telling Plaintiff that Plaintiff did not have funds in his account to pay for photocopies, and accusing Plaintiff of "trying to get over on the State of Michigan by getting free copies and filing claims in order to get money." (*Id.*, PageID.12.)

On March 25, 2023, Plaintiff filed a grievance against Defendant Thompson for the foregoing actions.  (*Id.*, PageID.13.)  Days later, Plaintiff witnessed Defendant Thompson speaking with Defendant Knaack and non-party Resident Unit Manager (RUM) Cope and saw Defendant Knaack look at Plaintiff with a "menacing stare."

(*Id.*)  RUM Cope eventually denied Plaintiff's grievance and did not provide Plaintiff with the requested law library materials.  (*Id.*)

Thereafter, Defendants Haggagi, Weber, Griffiths, Hinkle, and Carr began to conduct more frequent and "destructive" searches of Plaintiff's cell, resulting in Plaintiff's legal materials being destroyed or taken.  (*Id.*, PageID.14.)  When Plaintiff asked Defendants Griffiths, Carr, and Hinkle why they were searching Plaintiff's cell and legal property every day, Defendant Griffiths told Plaintiff that they would stop searching Plaintiff's property "when [Plaintiff] stop[s] creating problems with [his] legal bullshit."  (*Id.*)  Defendants Carr and Hinkle laughed.  (*Id.*)

During a cell search by Defendant Haggagi and Weber, Plaintiff informed Defendants that he was going to write a grievance and contact his attorney.  (*Id.*, PageID.15.)  Defendants then destroyed items of Plaintiff's legal property.  (*Id.*)

When Plaintiff spoke with Defendant Knaack regarding the searched by Defendants Haggagi, Weber, Griffiths, Hinkle, and Carr, Defendant Knaack called Plaintiff a "liar" and stated that the searching officers had his approval to search Plaintiff whenever they wanted.  (*Id.*, PageID.14–15.)  Defendant Knaack also told Plaintiff that he was not afraid of being sued and that Plaintiff's claims would be "thrown out instantly."  (*Id.*, PageID.16.)  Defendant Knaack then told Plaintiff, "Get the hell out of my office. . . go cry to your attorney, I don't care, I run this in here and can't nobody save you."  (*Id.*)

Following Plaintiff's interaction with Defendant Knaack, on July 20, 2023, Defendant Haggagi and Weber searched Plaintiff's cell. (*Id.*) During this search, pieces of Plaintiff's legal property were confiscated and Defendant Weber reported finding contraband, leaving Defendant Weber to issue Plaintiff a Class III misconduct report. (*Id.*; Jul. 20, 2023, Misconduct Report, ECF No. 1-3, PageID.57; Jul. 20, 2023, Contraband Removal Record, ECF No. 1-3, PageID.58.)

When Defendant Haggagi reviewed Plaintiff on the misconduct charge, Defendant Haggagi offered Plaintiff toplock sanctions in exchange for Plaintiff pleading guilty. (Compl., ECF No. 1, PageID.17.) Plaintiff did not accept the offer. (*Id.*) Defendant Haggagi told Plaintiff that he would tell Defendant Knaack to make sure that Plaintiff was found guilty. (*Id.*) On July 26, 2023, Defendant Knaack found Plaintiff guilty of the Class III misconduct, imposing four days of toplock sanctions. (*Id.*, PageID.18; Jul. 26, 2023, Misconduct Hearing Report, ECF No. 1-3, PageID.59.). During the hearing, Defendant Knaack refused to consider Plaintiff's arguments concerning the confiscation and destruction of Plaintiff's property. (Compl., ECF No. 1, PageID.19.)

On July 27, 2023, Plaintiff received a letter from his attorney dated July 24, 2023, asking Plaintiff to call his attorney "[i]f [he is] able . . . on Monday July 31st . . ." and also offering to speak with Plaintiff at a different time. (*Id.*, PageID.19; Jul. 24, 2023, Correspondence, ECF No. 1-6, PageID.86.) However, Defendant Haggagi began Plaintiff's toplock sanctions on July 31, 2023, so Plaintiff could not call his attorney at the suggested time. (Compl., ECF No. 1, PageID.18.) Moreover, Plaintiff

claims that the July 24, 2023, letter was not opened in his presence, "leaving it exposed for LCF's Staff to read." (*Id.*)

On August 1, 2023, Defendant Knaack moved Plaintiff to the "F-2 Forms." (*Id.*, PageID.19.)  During this move, Plaintiff lost his prison job. (*Id.*, PageID.19–20.)

On August 4, 2023, Plaintiff spoke with Defendants Blackmere and Cook and requested four grievance forms to file grievances against the "E-2 Prison Counselor and Defendants." (*Id.*, PageID.20.)  Defendants Blackmere and Cook refused to provide Plaintiff with the forms. (*Id.*)  Defendant Cook then gave Plaintiff a direct order to get away from the officers' desk. (*Id.*)

Plaintiff obtained the grievance forms from another inmate and typed then during his law library callout that afternoon. (*Id.*, PageID.21.)  When he later ran into Defendant Cook, Defendant Cook demanded that Plaintiff give him the forms, while reaching forward to grab Plaintiff's bag of legal papers. (*Id.*, PageID.22.)  Defendant Cook told Plaintiff that he would break Plaintiff's typewriter over Plaintiff's head if Plaintiff did not hand over the forms. (*Id.*)  Defendant Cook then confiscated Plaintiff's legal materials and told Plaintiff he would deploy his Taser if Plaintiff did not go away. (*Id.*)  Plaintiff contends that the loss of these documents "contributed to the dismissal of" *Tubbs v. Cunningham*. (*Id.*, PageID.23.)  Plaintiff filed a grievance and made Defendants Morrison, Rurka, and Cline aware of Defendant Cook's actions. (*Id.*) Defendants Cook, Blackmere, and Peek subsequently engaged in searches of Plaintiff's cell and person, destruction of Plaintiff's property, and verbal "threats" and "abuse." (*Id.*)

Plaintiff contends that the reviewers and respondents of his grievances did not adequately investigate his complaints, at times, called Plaintiff a "liar" or "exaggerator," and placed Plaintiff on "modified access." (*Id.*, PageID.23–24; Aug. 9, 2023, Memo, ECF No. 1-10, PageID.102.)

On August 10, 2023, Plaintiff's attorneys sent a letter to Defendant Morrison. (Compl., ECF No. 1, PageID.24; Aug. 10, 2023, Correspondence, ECF No. 1-9, PageID.99–100.)

On October 12, 2023, Plaintiff had an "emergency urinary bladder release dilemma." (Compl., ECF No. 1, PageID.24.)  Plaintiff used the E-2 restroom and then informed Defendant Haggagi of the issue. (*Id.*)  Defendant Haggagi wrote Plaintiff a Class II misconduct for being out of place, and the "responding officers" searched Plaintiff and took Plaintiff to segregation. (*Id.*, PageID.23–24.)   Though the misconduct was not "elevated" and, therefore, did not call for segregation according to Defendant Satterlee, Plaintiff remained in segregation for the night. (*Id.*, PageID.25.)

The following day, Defendant Alsuraimi gathered Plaintiff's legal papers and placed them in a trash bag marked as contraband. (*Id.*, PageID.26.)  Defendant Alsuraimi wrote Plaintiff a misconduct, completed a contraband removal record, and destroyed "items of [Plaintiff's] personal property." (*Id.*; Oct. 13, 2023, Contraband Removal Record, ECF No. 1-12, PageID.107; Oct. 13, 2023, Misconduct Report, ECF No. 1-12, PageID.108.)

On October 18, 2023, Plaintiff spoke with Defendant Cline, who ordered Plaintiff's immediate release from segregation.  (Compl., ECF No. 1, PageID.26.) That same day, non-party RUM Shaw conducted a hearing on the confiscation of Plaintiff's legal property by Defendant Alsuraimi.  (*Id.*, PageID.27.)  Defendant Rurka participated in the hearing.  (*Id.*, PageID.26.)  RUM Shaw dismissed the charges of excess property and ordered Plaintiff's legal property returned.  (*Id.*, PageID.27; Oct. 18, 2023, Misconduct Hearing Report, ECF No. 1-12, PageID.109.)  Plaintiff received his property but noticed that items were missing.  (Compl., ECF No. 1, PageID.26.)

When Plaintiff returned to the F-2 Dorms, he was initially allowed relative freedom of movement.  (*Id.*)  However, when Defendant Cook arrived for his shift, Defendant Cook denied Plaintiff access to certain areas and wrote Plaintiff a misconduct report.  (*Id.*, PageID.28; Oct. 19, 2023, Misconduct Report, ECF No. 1-15, PageID.116.)

On October 19, 2023, Defendant Cook told Defendant Peek to keep Plaintiff confined to his cell.  (Compl., ECF No. 1, PageID.28.)   Defendant Peek then threatened to place Plaintiff in restraints and segregation if Plaintiff left the unit and issued Plaintiff a misconduct report.  (*Id.*; Oct. 19, 2023, Misconduct Reports II, ECF No. 1-16, PageID.118–121.)

When Plaintiff later saw that Defendant Peek was in conversation, Plaintiff snuck out of the unit and went to the control center, asking to be placed in protective custody.  (Compl., ECF No. 1, PageID.29.)  Plaintiff told Defendant Cline of the actions of Defendants Cook and Peek.  (*Id.*)  Defendant Cline told Plaintiff that

11

Plaintiff was not on toplock sanctions and that he would look into Plaintiff's claims. (*Id.*)

Plaintiff also told Defendant Rurka of the reason for his visit to the control center. (*Id.*, PageID.30.) Defendant Rurka told Plaintiff to return to the dorm and that he would speak to Plaintiff later. (*Id.*) When Plaintiff tried to explain that the F-2 Dorms were not safe, Defendant Rurka told Plaintiff that the officers were not retaliating against Plaintiff, and he ordered another officer to "handle this bullshit." (*Id.*) Defendant LaMontagne then ordered Plaintiff back to the unit. (*Id.*) When Plaintiff again protested, a non-party officer ordered that Plaintiff be handcuffed and taken to segregation. (*Id.*) Defendants Peek and LaMontagne also issued Plaintiff misconduct reports. (*Id.*, PageID.31; Oct. 19, 2023, Misconduct Report III, ECF No. 1-18, PageID.123.) Defendant Cline reviewed the misconduct report issued by Defendant LaMontagne and noted, "prisoner bonded out per ADW Cline." (Compl., ECF No. 1, PageID.31; Oct. 19, 2023, Misconduct Report IV, ECF No. 1-18, PageID.125.)

On October 20, 2023, an administrative law judge held a hearing on the misconduct charges issued by Defendant Haggagi. (Compl., ECF No. 1, PageID.31) The administrative law judge determined that the charges were not a Class I misconduct and ordered them to be heard as a Class II misconduct. (*Id.*, PageID.32.) When Defendant LaMontagne reviewed the Class II charges, he found Plaintiff guilty of being out of place. (*Id.*)

Defendant Clemons reviewed the misconduct report issued by Defendant Peek. (*Id.*)  Defendant Clemons told Plaintiff that he believed that Plaintiff was lying, and he left to gather additional information.  (*Id.*)

On October 20, 2023, Plaintiff was transferred out of LCF to a new facility. (*Id.*, PageID.33.)  When Plaintiff arrived at the new facility, he noticed that multiple items of his personal and legal property were missing or destroyed.  (*Id.*, PageID.36.)

Plaintiff brings the following legal claims: "access to the courts/interference," "access to the courts/retaliation," "access to the courts/right to assistance," "freedom of expression/retaliation for speech," "freedom of expression/right to petition the government for redress of grievances," freedom from unreasonable search and seizure, equal protection, unconstitutional conditions of confinement, failure to protect, and due process.  (*Id.*, PageID.37–45.)[2]  He seeks compensatory and punitive damages. (*Id.*, PageID.47.)

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of

---

[2] Because Plaintiff specifically identifies the claims that Plaintiff intends to bring in this suit, the Court does not construe Plaintiff's complaint to raise any other claims.

action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

14

## A.    Counts I and III: First Amendment Access to the Courts Claims

Plaintiff claims that multiple Defendants interfered with Plaintiff's access to the courts.   He also claims that Defendant Thompson violated Plaintiff's First Amendment "right to assistance in bringing legal claims" by denying Plaintiff adequate law library services and materials.  (Compl.,. ECF No. 1, PageID.39.)

It is well established that prisoners have a constitutional right of access to the courts.  *Bounds v. Smith*, 430 U.S. 817, 821 (1977).  The right of access to the courts prohibits prison officials from erecting barriers that may impede the inmate's access to the courts.  *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

However, "[r]estricted access to the law library is not per se denial of access to the courts."  *Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir. 1985) (citation omitted).  "To state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury."  *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000.  In other words, a plaintiff must plead that the defendant's actions have hindered, or are presently hindering, efforts to pursue a nonfrivolous legal claim.  *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).  The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

15

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999) (en banc).  Moreover, the underlying action must have asserted a non-frivolous claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation."  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3).  "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant."  *Id.* at 415.

Plaintiff's complaint does not describe, with sufficient factual detail, the specific underlying causes of action that were allegedly hindered by Defendants' actions, let alone any well-pleaded factual allegations that would allow the Court to infer that Defendants' actions hindered a non-frivolous legal claim in a direct appeal, habeas corpus application, or civil rights claim.  Therefore, the Court will dismiss any First Amendment claims for interference with Plaintiff's access to the courts.

### B.    Counts II and IV: First Amendment Retaliation Claims

In Counts II and IV, Plaintiff claims that Defendants Haggagi, Weber, Griffiths, Hinkle, Carr, Knaack, Cook, Blackmere, Peek, Clemons, LaMontagne, Satterlee, Alsuraimi, Thompson, Rurka, Cline, and Morrison retaliated against him

for "exercising his right to access the court" (Compl., ECF No. 1, PageID.38) and for "exercising his right to free speech" (*id.*, PageID.40).   Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X*, 175 F.3d at 394.  To set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to show that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff alleges that the various retaliatory acts occurred after he filed grievances and lawsuits.  Plaintiff has therefore sufficiently alleged that he engaged in First Amendment protected conduct.  *See Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002); *Smith*, 250 F.3d at 1037; *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). The Court will consider below whether Plaintiff has alleged sufficient facts regarding the second and third elements for the named Defendants.

### 1. Defendant Satterlee

Plaintiff alleges only that Defendant Satterlee told Plaintiff that the Class II misconduct report issued by Defendant Haggagi on October 12, 2023, did not call for segregation.   (Compl., ECF No. 1, PageID.25.)   Plaintiff does not allege that Defendant Satterlee ever took any action against Plaintiff.   Therefore, Plaintiff's

allegations fail to plausibly suggest any adverse action by Defendant Satterlee sufficient to deter a person of ordinary firmness from engaging in First Amendment protected activity.  Plaintiff's retaliation claim against Defendant Satterlee will be dismissed.

### 2.  Defendants Alsuraimi, LaMontagne, and Thompson

Plaintiff claims that, on October 13, 2023, Defendant Alsuraimi gathered Plaintiff's legal papers and placed them in a trash bag marked as contraband and as containing "12-legal folders, etc." (*Id.*, PageID.26.) Defendant Alsuraimi wrote Plaintiff a misconduct, completed a contraband removal record, and destroyed "items of [Plaintiff's] personal property." (*Id.*)

Plaintiff alleges that Defendant LaMontagne then ordered Plaintiff back to the unit on the order of Defendant Rurka. (*Id.*, PageID.30.)  Defendant LaMontagne later issued Plaintiff a misconduct report, which was ultimately overturned by Defendant Cline, and found Plaintiff guilty of a separate misconduct charge for being out of place. (*Id.*, PageID.31.)

Finally, Plaintiff claims that Defendant Thompson denied Plaintiff access to law library materials and photocopies, including MDOC orders related to the MDOC's response to COVID-19, explaining that she did not know what documents Plaintiff was requesting and that Plaintiff was not allowed any more free copies until he paid his debts. (*Id.*, PageID.11.)

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence.  *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*,

18

598 F. Supp. 501, 506 (N.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985).  However, "because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations."  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted).  Therefore, "alleging merely the ultimate fact of retaliation is insufficient."  *Murphy*, 833 F.2d at 108.  "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'"  *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Skinner v. Bolden*, 89 F. App'x. 579, 579–80 (6th Cir. 2004) (without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory motive).

Here, Plaintiff's fails to offer any facts that would plausibly suggest that Defendants Alsuraimi, LaMontagne, and Thompson were motivated by retaliatory animus.  Indeed, Plaintiff's complaint does not suggest that these Defendants were even aware of the grievances and lawsuits submitted by Plaintiff.  And while Plaintiff alleges that an "on-looking inmate bystander" told Plaintiff that Defendant Thompson was not assisting Plaintiff with Plaintiff's requests because Defendant Thompson "doesn't like the fact that [Plaintiff was] suing staff" (Compl., ECF No. 1, PageID.11), Plaintiff's complaint provides no facts that would suggest that this statement was anything other than the unfounded opinion of an unnamed bystander.

19

Accordingly, the Court will dismiss Plaintiff's First Amendment retaliation claims against Defendants Alsuraimi, LaMontagne, and Thompson.

### 3. Defendant Clemons

Plaintiff alleges that Defendant Clemons reviewed the misconduct report issued by Defendant Peek, told Plaintiff that he believed that Plaintiff was lying, and left to gather additional information.  (Compl., ECF No. 1, PageID.32.)

In *Thaddeus-X*, the Sixth Circuit recognized that some threats and deprivations are too minimal to constitute adverse action.  There, the court held that minor harassment is insufficient to constitute adverse action, because recognition of such a standard would "trivialize the First Amendment."  *Thaddeus-X*, 175 F.3d at 398–99 (internal quotation marks and citation omitted).  A specific threat or comment may satisfy the adverse action requirement if it would deter a person of ordinary firmness from exercising his First Amendment rights.  *Id.* at 398; *see also Reynolds-Bey v. Harris*, 428 F. App'x 493, 503 (6th Cir. 2011) (collecting cases).  However, certain threats or deprivations are so *de minimis* that they do not raise to the level of being constitutional violations.  *Thaddeus-X*, 175 F.3d at 398.

The Court finds that Defendant Clemons statement to Plaintiff that Plaintiff was lying is one such comment that is so *de minimis* that it does not rise to the level of an adverse action for First Amendment purposes.  Accordingly, the Court will dismiss Plaintiff's First Amendment claim against Defendant Clemons.

### 4. Defendants Morrison, Rurka, and Cline

Plaintiff alleges that Defendants Morrison, Rurka, and Cline were responsible for prisoner placement at LCF, first assigning Plaintiff to the E-2 Dorms (Compl.,

ECF No. 1, PageID.8), that Plaintiff contacted Defendants Morrison, Rurka, and Cline "in the hopes of finding relief and resolve without being subjected to more backlash," but did not receive relief, (*id.*, PageID.10), and that these Defendants were aware of Defendant Cook's actions in confiscating Plaintiff's legal materials (*id.*, PageID.23).

To the extent that Plaintiff seeks to hold these Defendants liable for the actions of their subordinates, he may not do so. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

21

The Sixth Circuit has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Plaintiff has not alleged facts that would demonstrate that Defendants Morrison, Rurka, and Cline knowingly authorized or acquiesced in any of the events described in Plaintiff's complaint that could be said to have amounted to a violation of Plaintiff's constitutional rights.  Therefore, any alleged failure to act, without more, does not give rise to liability under Section 1983. *See Grinter*, 532 F.3d at 576; *Shehee*, 199 F.3d at 300.

Second, with respect to Plaintiff's claim that Defendants Morrison, Rurka, and Cline moved Plaintiff to a disciplinary unit even though Plaintiff did not have any incidents of discipline, Plaintiff does not allege that these Defendants were aware that Plaintiff engaged in any protected activity prior to this move.  Therefore,

22

Plaintiff's complaint contains no facts to allow this Court to infer that Defendants' decision to move Plaintiff was motivated by retaliatory animus for such activity.

Third, Plaintiff contends that the reviewers and respondents of his grievances—which may include Defendants Morrison, Rurka, and Cline—did not adequately investigate Plaintiff's complaints, at times, called Plaintiff a "liar" or "exaggerator," and placed Plaintiff on "modified access."   (Compl., ECF No. 1, PageID.23–24.)  However, many courts, including this one, have held that the denial or refusal to process a grievance is not adverse action.  *See, e.g., Cameron v. Gurnoe*, No. 2:19-cv-71, 2019 WL 2281333, at *4–5 (W.D. Mich. May 29, 2019) (citing cases); *Branch v. Houtz*, No. 1:16-cv-77, 2016 WL 737779, at *6 (W.D. Mich. Feb. 25, 2016); *Ross v. Westchester Cnty. Jail*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at *8 (S.D.N.Y. Jan. 11, 2012) (discussing that the refusal to file a grievance is, without more, insufficient to constitute an adverse action); *Stone v. Curtin*, No. 1:11-cv-820, 2011 WL 3879505, at *4 (W.D. Mich. Aug. 31, 2011) (concluding that the failure to process a prison grievance would not deter a prisoner of ordinary firmness from exercising his right to file a grievance); *Green v. Caruso*, No. 1:10-cv-958, 2011 WL 1113392, at *10 (W.D. Mich. Mar. 24, 2011) (finding that the denial of a prisoner's grievances was not sufficiently adverse to support a retaliation claim); *Burgos v. Canino*, 641 F. Supp. 2d 443, 454 (E.D. Pa. 2009), aff'd, 358 F. App'x 302 (3d Cir. 2009) (discussing that the rejection or denial of prison grievances does not constitute an adverse action for purposes of a retaliation claim).  Moreover, Plaintiff has not alleged any facts that

23

would plausibly suggest that the lack of response or relief by Defendants Morrison, Rurka, and Cline was motivated by retaliatory animus in any way.

Moreover, to the extent that Plaintiff seeks to bring a claim of First Amendment retaliation based upon his placement on modified access, the Sixth Circuit has held that "that placement on modified access status does not constitute an adverse action when the protected activity was filing administrative grievances." *Jackson v. Madery*, 158 F. App'x 656, 660 (6th Cir. 2005), *abrogated on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018).  The Court notes that the Sixth Circuit has held that modified access to the grievance process does not deny a Michigan prisoner the right or ability to seek redress for meritorious grievances. *Kennedy v. Tallio*, 20 F. App'x 469, 470 (6th Cir. 2001).  Rather, it requires the prisoner to obtain permission from the grievance coordinator to file a grievance.  *Id.* Plaintiff does not allege that he was ever denied the opportunity to file a *meritorious* grievance.

Plaintiff also claims that Defendant Cline ordered Plaintiff's immediate release from segregation, (Compl., ECF No. 1, PageID.26), told Plaintiff that Plaintiff was not on toplock sanctions when Plaintiff visited the control center (*id.*, PageID.29), and overturned Defendant LaMontagne's misconduct report (*id.*, PageID.31.) These allegations do not plausibly suggest adverse action within the meaning of the First Amendment.

24

Finally, Plaintiff alleges that Defendant Rurka told Plaintiff that the other officers were not retaliating against Plaintiff and ordered another officer to "handle this bullshit" when Plaintiff refused to leave the control center as instructed.  (*Id.*, PageID.30.)  As discussed above, the mere statement that Defendant Rurka did not believe that other officers were retaliating against Plaintiff is simply too *de minimis* to rise to a constitutional violation.  As to Plaintiff's claim that Defendant Rurka told another officer to "handle this bullshit" when Plaintiff refused to leave the control center as instructed, the Sixth Circuit explained in *Thaddeus–X*, "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one" of the three-step retaliation analysis.  *Thaddeus-X*, 175 F.3d at 394; *see Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (holding that insolence is not protected conduct for First Amendment purposes).   Here, Defendant told Plaintiff to leave the control center, but Plaintiff refused. "Disobeying a Direct Order" is a legitimate Class II misconduct violation.  *See* MDOC Policy Directive 03.03.105, Attach. B. Section 1983 does not provide redress for a violation of prison policies.  *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995); *Sweeton v. Brown*, 27 F.3d 1162, 1166 (6th Cir. 1994).

Therefore,  the  Court  will  dismiss  Plaintiff's  retaliation  claims  against Defendants Morrison, Rurka, and Cline.

### 5. Defendants Haggagi, Weber, Griffiths, Hinkle, Carr, Knaack, Cook, Blackmere, and Peek

Plaintiff alleges that Defendants Haggagi, Weber, Griffiths, Hinkle, Carr, Knaack, Cook, Blackmere, and Peek engaged in baseless and destructive searches

and issued Plaintiff various misconduct reports.  Taking Plaintiff's allegations as true as is required at this stage, the Court will allow Plaintiff to proceed with his claims of First Amendment retaliation against Defendants Haggagi, Weber, Griffiths, Hinkle, Carr, Knaack, Cook, Blackmere, and Peek.

### C.    Count V: First Amendment Freedom of Expression/Right to Petition the Government for Redress of Grievances Claims

Plaintiff alleges that Defendants violated his First Amendment right to petition the government through their interference with Plaintiff's use of the grievance process, intrusively monitoring Plaintiff's attorney-client communications, and the confiscation and destruction of Plaintiff's legal materials.

First, any actions (or inactions) of Defendants with regard to the grievance process could not constitute a violation of the First Amendment right to petition the government.  The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond).

Plaintiff has not been barred from all means of petitioning the government for redress of grievances.  Even if Plaintiff had been improperly prevented from filing a grievance, his right to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances.  The exhaustion requirement only mandates exhaustion of *available* administrative

26

remedies. *See* 42 U.S.C. § 1997e(a).  If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action.  *See Ross v. Blake*, 578 U.S. 632, 640–44 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001).

Second, within the context of this count, Plaintiff alleges that he was denied legal mail and that his legal mail was "intrusively monitor[ed]."  (Compl., ECF No. 1, PageID.41.)  It appears that Plaintiff refers to his allegations that a letter was sent from Plaintiff's attorney on July 24, 2023, via priority mail, but Plaintiff did not receive the letter until July 27, 2023.  (*Id.*, PageID.19.)  Moreover, Plaintiff claims that the mail was not opened in his presence, "leaving it exposed for LCF's Staff to read."  (*Id.*)

"A prisoner's right to receive mail is protected by the First Amendment." *Knop*, 977 F.2d at 1012 (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  "Mail is one medium of free speech, and the right to send and receive mail exists under the First Amendment." *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427 (1993)).  A prisoner, however, retains only those First Amendment freedoms which are "not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections systems." *Martin v. Kelley,* 803 F.2d 236, 240 n.7 (6th Cir. 1986) (*quoting Pell*, 417

27

U.S. at 822); *see Turner v. Safley,* 482 U.S. 78 (1987).  Those legitimate penological objectives include prison security and the objective of maintaining a secure prison allows "prison officials [to] open prisoners' incoming mail pursuant to a uniform and evenly applied policy . . . ." *Lavado v. Keohane*, 992 F.2d 601, 607 (6th Cir. 1993).

But legal mail may impact a "prisoner's legal rights, the attorney-client privilege, or the right of access to the courts."  *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003)  When those rights are at stake, a "prison official['s unfettered discretion to open and read an inmate's mail because [of] a prison's security needs do[es] not automatically trump a prisoner's First Amendment right to receive mail . . . ." *Id.*  To protect those rights, courts have extended protections to prisoners' legal mail that do not exist for general mail.  For example, "the opening of 'legal mail' should generally be in the inmate's presence." *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996) (citing *Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974)).

"[W]hat constitutes 'legal mail' is a question of law."  *Sallier*, 343 F.3d at 871.  "Mail from an attorney . . . is legal mail as a matter of law."  *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 643 (6th Cir. 2015) (citing *Sallier*, 343 F.3d at 877).  This includes where the attorney does not have an established attorney-client relationship.  *See id.*  Plaintiff's allegations suffice to show that the mail at issue here is "legal mail."

The Sixth Circuit has held that "'blatant disregard' for mail handling regulations concerning legal mail violates constitutional protections," *Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009) (citing *Lavado*, 992 F.2d at 609), and

28

that "[t]wo or three pieces of mail opened in an arbitrary or capricious way suffice to state a claim." *Id.* (citing *Sallier*, 343 F.3d at 879–80; *Lavado*, 992 F.2d at 609). However, "isolated instances of interference with prisoners' mail" may not rise to the level of a constitutional violation under the First Amendment. *See Johnson v. Wilkinson*, No. 98-3866, 2000 WL 1175519 (6th Cir. Aug. 11, 2000) ("This random and isolated interference with Johnson's mail did not violate his constitutional rights." (citation omitted)); *see also Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) (holding that an "isolated incident, without any evidence of improper motive resulting interference with [the inmate's] right to counsel or to access to the courts, does not give rise to a constitutional violation" (citations omitted)); *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003) (stating that "Okoro was only able to provide one specific incident where he allegedly did not receive the full contents of a letter from his wife," and concluding that "[s]uch a random and isolated incident is insufficient to establish a constitutional violation" (citation omitted)); *cf. Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010) (citing *Johnson* for the holding that "isolated interference" with prisoners' rights may not rise to the level of a First Amendment violation). Recently, in *Smith v. Goostrey*, No. 23-1025, 2023 WL 5024659 (6th Cir. Aug. 4, 2023), the Sixth Circuit, citing *Colvin*, confirmed that a single isolated event of tampering with legal mail "does not rise to the level of a constitutional violation." *Id.* at *3.

Here, Plaintiff alleges that his legal mail was opened outside of his presence on a single occasion. These facts, accepted as true, do not suggest blatant disregard

for mail handling.  *See Anderson v. Andrews*, No. 2:09-cv-109, 2010 WL 3475030, at *8 (W.D. Mich. June 29, 2010) ("[T]he opening of one piece of properly marked legal mail outside the prisoner's presence is not enough to state a claim."), *R & R adopted*, 2010 WL 3474988 (Sept. 2, 2010).

Moreover, Plaintiff does not attribute these actions to any named Defendant. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants.  *See Twombly*, 550 U.S. at 555–61 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim); *see also Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights).  Any "[s]ummary reference to a single, five-headed 'Defendants' [or staff] does not support a reasonable inference that each Defendant is liable . . . ." *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citation omitted).

Accordingly, for each of the foregoing reasons, Plaintiff cannot state a claim regarding interference with his legal mail.[3]

---

[3] Though Plaintiff frames his claim as one under the First Amendment, Plaintiff also appears to claim that Defendants violated Plaintiff's right to the attorney-client privilege by reading Plaintiff's legal documents and denying Plaintiff telephone calls with his attorney. Not only does Plaintiff fail to allege facts that would implicate the attorney-client privilege as to the missing legal documents, but "[s]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." *Clutchette v. Rushen,* 770 F.2d 1469, 1471 (9th Cir.1985); *see also, Dye v. Hofbauer,* 197 Fed. Appx. 378, 383 (6th Cir. 2006) ("The attorney-client privilege is a creation of the common law, and a violation of this privilege generally does not constitute" a constitutional violation.). Plaintiff can plead a violation of his Sixth Amendment rights by invasion of the attorney-client relationship only if he

### D.     Claim VI: Fourth Amendment Claims of Unreasonable Search and Seizure

Plaintiff brings claims for unreasonable searches and seizures of his legal property.   The Fourth Amendment protects against unreasonable searches and seizures of one's person.  U.S. Const. amend. IV.  However, in *Hudson v. Palmer*, 468 U.S. 517 (1984), the Supreme Court considered and rejected a Fourth Amendment claim concerning the seizure of legal papers.

In *Hudson*, a prison official searched a prisoner's cell and destroyed some of his legal papers in the process.  *Id.* at 519, 535.  The prisoner claimed that the prison official's conduct constituted an unreasonable search and seizure of his property, in violation of the Fourth Amendment.  *Id.* at 530.  The Court disagreed.

First, the Court recognized that while prisoners are not beyond the reach of the Constitution, "curtailment of certain rights is necessary, as a practical matter, to accommodate a 'myriad of institutional needs and objectives' of prison facilities, . . . chief among which is internal security." *Id.* at 523–24 (internal citation omitted).

The Court then determined that the official's search of the prisoner's cell did not violate the Fourth Amendment because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Id.* at 526.  According to the Court, "[a] right of privacy in traditional

---

pleads facts to show that the invasion caused Plaintiff to be deprived of his right to counsel or his right to the effective assistance of counsel in a criminal case against him. *See Dye*, 197 Fed. Appx. at 383; *United States v. Castor,* 937 F.2d 293, 297 (7th Cir.1991); *United States v. Hernandez,* 937 F.2d 1490, 1493 (9th Cir.1991) (citing *Weatherford v. Bursey,* 429 U.S. 545, 554–57 (1977)). Plaintiff has not made that showing.

Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527–28.

For similar reasons, the Court held that "the Fourth Amendment does not protect against seizures in a prison cell [.]" *Id.* at 528 n.8.  According to the Court, "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.*

Applying *Hudson* to the case at hand, because the Fourth Amendment does not prohibit the confiscation of legal papers within a prisoner's cell, Plaintiff fails to state a claim for a violation of his Fourth Amendment rights.

### E.    Claim VII: Fourteenth Amendment Equal Protection Claim

Plaintiff alleges that Defendants' actions violated Plaintiff's right to equal protection.  The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. Const. amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To state an equal protection claim, Plaintiff must plead facts to show "intentional and arbitrary discrimination" by the state; that is, Plaintiff must show that Plaintiff "has been intentionally treated differently from others similarly situated." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  The threshold element of an equal protection claim is disparate treatment.  *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).  Further, "'[s]imilarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek*

32

*v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)).

Plaintiff's complaint contains no facts or allegations to support an equal protection claim. He alleges that his cellmates were not searched in the same manner that he was searched. However, Plaintiff does not provide the Court with any facts that would suggest that these prisoners were similarly situated to Plaintiff in all relevant respects but treated differently. Instead, Plaintiff's allegations of discriminatory treatment are wholly conclusory, which, again, fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Accordingly, Plaintiff's equal protection claim will be dismissed.

### F. Claim VIII and IX: Eighth Amendment Cruel and Unusual Punishment Claims

Plaintiff alleges that Defendants violated his Eighth Amendment rights through "calculated harassment," including harassing searches, confiscation and destruction of property sanctions, general misconduct, and through the failure to protect against such actions. (Compl., ECF No. 1, PageID.43–44.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of

life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich,* 148 F.3d 596, 600–01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.  "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347).  Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

For a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims).  The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37.  To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.  Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837.  "[I]t is enough

34

that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Here, Plaintiff's Eighth Amendment claims fail because he does not allege any facts suggesting that Defendants' actions denied him any basic human needs. First, the use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not rise to constitutional dimensions. *See Ivey*, 832 F.2d 950, 954–55 (6th Cir. 1987); *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (holding that harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 455 (6th Cir. 2012) (noting that "[v]erbal harassment or idle threats by a state actor do not create a constitutional violation and are insufficient to support a section 1983 claim for relief" (citing *Ivey*, 832 F.2d at 955)); *Miller v. Wertanen*, 109 F. App'x 64, 65 (6th Cir. 2004) (affirming district court's conclusion that verbal harassment in the form of a threatened sexual assault "was not punishment that violated Miller's constitutional rights" (citing *Ivey*, 832 F.2d at 955)); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth

35

Amendment does not afford us the power to correct every action, statement, or attitude of a prison official with which we might disagree."). Therefore, the Court will dismiss Plaintiff's Eighth Amendment claims premised upon "harassment."

Second, with respect to Plaintiff's claims concerning misconduct sanctions, including segregation, the Sixth Circuit has held that, "[b]ecause placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment claim." *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Murray v. Unknown Evert*, 84 F. App'x. 553, 556 (6th Cir. 2003). The Sixth Circuit has also held that, without a showing that basic human needs were not met, the denial of privileges cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey*, 524 F.3d at 795. In light of *Harden-Bey*, given that placement in segregation does not amount to an Eighth Amendment violation, logic dictates that lesser sanctions, including the loss of various privileges, would likewise be insufficient to support an Eighth Amendment claim. *See Alexander v. Vittitow*, No. 17-1075, 2017 WL 7050641, at *5 (6th Cir. Nov. 9, 2017).

Finally, the Court is sympathetic to Plaintiff's frustration over the numerous shakedowns of his cell, some of which led to the destruction of some of his personal property. However, such conduct does not rise to the level of cruel and unusual punishment that violates the Eighth Amendment. *See, e.g.*, *Roper v. Johnson*, No. 2:19-cv-2061, 2020 WL 224601, *2-3 (N.D. Ohio Jan. 15, 2020) (dismissing prisoner's

36

claim that search of his cell and destruction of his property constituted cruel and unusual punishment); *Williams v. Washington*, No. 2:18-cv-144, 2018 WL 6190497, *12 (W.D. Mich. Nov. 28, 2018) (concluding that frequent cell searches and pat downs did not rise to the level of an Eighth Amendment violation). "Frequent cell searches alone, while perhaps annoying, do not present a danger to the inmate's health or safety and do not implicate the Eighth Amendment." *King v. Fender*, No. 1:22-cv-1372, 2022 WL 17082065, at *3 (N.D. Ohio Nov. 18, 2022).

Accordingly, for each of the foregoing reasons, the Court will dismiss Plaintiff's Eighth Amendment claims.

### G.    Claim X: Fourteenth Amendment Due Process Claims

Plaintiff brings claims for violation of his Fourteenth Amendment right to due process based upon the confiscation and destruction of his property, interference with his use of the grievance process, misconduct hearings and sanctions, and loss of his prison job.

The Fourteenth Amendment protects an individual from deprivation of life, liberty[,] or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

37

### 1.    Confiscation and Destruction of Property

Plaintiff's due process claims concerning the confiscation and destruction of his property are barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).  Under *Parratt*, an individual deprived of property by a "random and unauthorized act" of a state employee cannot maintain a federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  If an adequate post-deprivation remedy exists, the deprivation, while real, is not "without due process of law."  *Id.* at 537.  This doctrine applies to both negligent and intentional deprivations of property, as long as the deprivation was not pursuant to an established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530–36 (1984).  Plaintiff must plead and prove the inadequacy of state post-deprivation remedies.  *See Copeland v. Machulis*, 57 F.3d 476, 479–80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993).  The Sixth Circuit has noted that a prisoner's failure to sustain this burden requires dismissal of his § 1983 due process action.  *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Here, Plaintiff fails to allege that his state post-deprivation remedies are inadequate.  And Plaintiff has available to him numerous state post-deprivation remedies.  The Sixth Circuit has specifically held that Michigan provides adequate post-deprivation remedies for deprivation of property.  *See Copeland*, 57 F.3d at 480.  Plaintiff fails to allege any reasons why a state-court action would not afford him complete relief for the deprivations, either negligent or intentional, of his property.  Accordingly, Plaintiff fails to state a Fourteenth Amendment due process claim regarding the confiscation and destruction of his property.

### 2.  Use of the Grievance Process

Plaintiff also has no due process right to file a prison grievance.  The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan,* 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases).  Michigan law does not create a liberty interest in the grievance procedure.  *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, the conduct of Defendants did not deprive Plaintiff of due process.

### 3.  Loss of Prison Job

Plaintiff's claim regarding the loss of his prison job fails at the first step of the due process analysis because "no prisoner has a constitutional right to a particular job or to any job." *See Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987); *see also Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (discussing that prisoners have no constitutional right to rehabilitation, education or jobs); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (holding that there is no constitutional right to prison employment); Moreover, "as the Constitution and federal law do not create a property right for inmates in a job, they likewise do not create a property right to wages for

39

work performed by inmates." *See Carter v. Tucker*, 69 F. App'x 678, 80 (6th Cir. 2003) (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991); *James v. Quinlan*, 866 F.2d 627, 629–30 (3d Cir. 1989)).  Consequently, Plaintiff's loss of his job assignment did not trigger a right to due process, and his Fourteenth Amendment due process claim will be dismissed.

### 4.  Misconduct Charges

As to Plaintiff's due process claims concerning his misconduct hearings, the Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner.  *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).  A prisoner's ability to challenge a prison misconduct conviction therefore depends on whether the conviction implicated any liberty interest.  A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *See Sandin v. Conner*, 515 U.S. at 484, 487.

The allegations of Plaintiff's complaint do not plausibly suggest that Plaintiff's misconduct convictions affected any interests that would fall into either of the categories identified in *Sandin* as protected by due process, i.e., an inevitable effect on the duration of Plaintiff's sentence or an atypical and significant hardship.

First, Plaintiff alleges that he received convictions for Class II and III misconduct charges.  The Sixth Circuit has routinely held that misconduct convictions that do not result in the loss of good time are not atypical and significant

40

deprivations and therefore do not implicate due process.  *See, e.g., Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004), *overruled on other grounds by Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003); *Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999).  Under MDOC Policy Directive 03.03.105, ¶ C (eff. Apr. 18, 2022), a Class I misconduct is a "major" misconduct and Class II and III misconducts are "minor" misconducts.  The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a Class I misconduct.  *Id.* ¶ DDDD.  Here, because Plaintiff's complaint alleges only Class II and III misconduct charges, Plaintiff's misconduct charges could not have resulted in the loss of good time credits.

Second, Plaintiff has not alleged facts that would plausibly suggest that he suffered a "significant and atypical deprivation."  Plaintiff alleges that he received toplock sanctions as a result of the misconduct convictions.  Pursuant to MDOC Policy Directive 03.03.105, a prisoner on toplock is confined to his cell or bunk area, cannot leave without authorization from a staff member, and may be denied other privileges, such as use of his personal radio or television.  MDOC Policy Directive 03.03.105, Attach. E.

In assessing the significance of Plaintiff's sanctions, the Court is guided by precedent related to the most significant sanction: segregation.  The Supreme Court has held that even placement in segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration."  *Hewitt*,

41

459 U.S. at 468.  Thus, it is considered atypical and significant only in "extreme circumstances."  *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010).  Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship."  *Harden-Bey*, 524 F.3d at 794.

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship.  *Sandin*, 515 U.S. at 484.  Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process.  *See Joseph*, 410 F. App'x at 868 (61 days in segregation is not atypical and significant).  It has also held, in specific circumstances, that confinement in segregation for a much longer period does not implicate a liberty interest.  *See, e.g.*, *Jones v. Baker*, 155 F.3d 810, 812–13 (6th Cir. 1998) (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding).

Where stays of months in the most restrictive sanction of segregation are not considered an atypical or significant hardship, *see Joseph*, 410 F. App'x at 868, it defies logic to suggest that the lesser penalty of toplock for days could be atypical or significant.  Sixth Circuit authority bears that out.  *See Langford v. Koskela*, No. 16-1435, 2017 WL 6803554, at *3 (6th Cir. Jan. 24, 2017) (holding that thirty days'

toplock and thirty days' loss of privileges "does not amount to an 'atypical and significant hardship'").

Therefore, even taking Plaintiff's allegations as true, Plaintiff cannot state a claim for violation of his Fourteenth Amendment right to procedural due process.  The Court will dismiss any such claims.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Alsuraimi, Clemons, Satterlee, LaMontagne, Thompson, Rurka, Cline, Morrison, and Lester will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court will also dismiss, for failure to state a claim, the following claims against the remaining Defendants Haggagi, Weber, Knaack, Cook, Griffiths, Carr, Blackmere, and Peek: First Amendment claims concerning Plaintiff's access to the courts, Plaintiff's right to petition the government, and Plaintiff's legal mail and attorney-client communications, Sixth Amendment claims, Fourth Amendment claims for unreasonable search and seizure, Eighth Amendment claims, and Fourteenth Amendment equal protection and due process claims.  Plaintiff's First Amendment retaliation claims against Defendants Haggagi, Weber, Knaack, Cook, Griffiths, Carr, Blackmere, and Peek remain in the case.

An order consistent with this opinion will be entered.

Dated:   April 20, 2026                          /s/ Phillip J. Green
                                                 PHILLIP J. GREEN
                                                 United States Magistrate Judge

43